OPINION OF THE COURT
Chief Judge Wachtler.
The petitioners — four brewers, several beer wholesalers and a beer wholesalers’ trade association — brought these proceedings to quash subpoenas duces tecum and interrogatories served upon them by the Attorney-General pursuant to an investigation into marketing practices in the beer industry which the Attorney-General alleges may violate the State’s antitrust laws. The central issue posed by this appeal, here by leave of the Appellate Division,[1] is whether that court properly granted the applications on the ground that the focus of the investigation is an activity which is per se legal under State law and therefore beyond the scope of the Attorney-General’s investigatory powers.
We hold that General Business Law § 343 authorizes the Attorney-General to investigate the practice in question and that it was error, therefore, to quash the subpoenas and interrogatories.
*331 I.
The subpoenas and interrogatories now challenged were issued to the petitioners beginning in May 1985 as part of an investigation by the Attorney-General into the pervasive use in the beer industry of exclusive territorial distributorships. The Attorney-General alleges — and petitioners do not dispute for purposes of these proceedings — that since 1982 brewers and wholesaler distributors have entered into agreements establishing exclusive territorial rights to sell each brewer’s products to retail outlets. According to the Attorney-General, under this scheme, the brewer agrees to sell its products to only one designated wholesaler in a given territory and that wholesaler, in turn, agrees not to sell the brewer’s products outside that territory or to anyone inside the territory who would resell the products elsewhere. The aim of these agreements, allegedly, is to eliminate intrabrand competition by "transshippers”, independent wholesalers who, prior to the advent of these agreements, could buy beer from a franchised wholesaler in one territory and sell it in another territory, in competition with another franchised wholesaler.
The parties agree that, to the extent that this arrangement results in a restraint of trade, it is a "vertical” restraint — that is, one imposed by an agreement between noncompetitors who occupy different levels in the distribution chain — as opposed to a "horizontal” restraint, which results from an agreement among competitors at the same level of distribution. The Attorney-General contends that, although such vertical restraints are not per se illegal under New York’s antitrust law (the Donnelly Act; General Business Law § 340 et seq.), they may be found to be illegal if, under all the circumstances, they impose an unreasonable restraint on competition. Petitioners concede that the "rule of reason” analysis urged by the Attorney-General would be employed to determine if the practice violates Federal antitrust law (see, e.g., Continental T. V. v GTE Sylvania, 433 US 36), but they argue that the courts of this State have ruled that such vertical restraints are per se legal under the Donnelly Act. Accordingly, they conclude, the Attorney-General lacks authority to conduct an investigation designed to facilitate a rule of reason analysis of the brewing industry practice.
II.
An application to quash a subpoena should be granted "[o]nly where the futility of the process to uncover anything *332 legitimate is inevitable or obvious” (Matter of Edge Ho Holding Corp., 256 NY 374, 382) or where the information sought is " 'utterly irrelevant to any proper inquiry’ ” (Matter of La Belle Creole Intl., S. A. v Attorney-General of State of N. Y, 10 NY2d 192, 196, quoting Matter of Dairymen’s League Coop. Assn. v Murtagh, 274 App Div 591, 595, affd 299 NY 634). In defending his inquiry, the Attorney-General enjoys a presumption that he is acting in good faith (Matter of Ryan v Lefkowitz, 26 AD2d 604, affd 18 NY2d 977) and must show only that the materials sought bear "a reasonable relation to the subject matter under investigation and to the public purpose to be achieved” (Carlisle v Bennett, 268 NY 212, 217; see also, Virag v Hynes, 54 NY2d 437, 442; Matter of Goldin v Greenberg, 49 NY2d 566, 572; Matter of La Belle Creole Intl., S. A. v Attorney-General of State of N. Y, supra, at 196).
Thus, the precise question presented by these proceedings is brought into focus. The question is not whether all vertical restraints of this type should, in the context of these proceedings, be declared legal per se or, on the other hand, subject to a rule of reason analysis. Instead, the question is whether the Attorney-General has authority under the Donnelly Act to issue the subpoenas and interrogatories challenged here, a question which must be answered in the affirmative unless the legality of the brewers’ marketing practice is so well established, either by the plain language of the statute or by existing judicial interpretation, as to be free from doubt. If the legality of the brewing industry’s vertical restraints is arguable, then the subpoenas issued pursuant to the Attorney-General’s broad powers to investigate possible violations of the Donnelly Act (see, General Business Law § 343)[2] must be sustained (see, Matter of Nicholson v State Commn. on Judicial Conduct, 50 NY2d 597, 610-611).
Petitioners effectively concede as much, because the focus of their argument is not that we should announce a rule of per *333 se legality, but rather that such a rule has already been established by "seven decades of unanimous precedent” and that the Legislature has acquiesced in such an interpretation of the Donnelly Act by failing to amend the statute to overrule those decisions. We conclude, however, that the cases cited by petitioners do not conclusively establish, either singly or in combination, a rule of per se legality for vertical territorial arrangements. Nor does the statutory language foreclose the Attorney-General’s position that such arrangements, if shown to result in an unreasonable restraint of trade under the circumstances, are prohibited.
III.
The Donnelly Act declares, among other things, that "[e]very contract, agreement, arrangement or combination whereby * * * [competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained [is] against public policy, illegal and void” (General Business Law § 340 [1]). This language is clearly broad enough, on its face, to encompass the vertical restraints in issue. There is no dispute for present purposes that the target of the Attorney-General’s investigation — exclusive territorial distributorships — restricts intrabrand competition in the beer industry.
We recognize that neither the Donnelly Act nor the Sherman Act, after which it was modeled, has been interpreted as prohibiting every agreement that has the effect of restraining trade, no matter how minimal. Instead, as construed by State and Federal courts, the antitrust laws prohibit only "unreasonable” restraints on trade (see, Northern Pac. Ry. Co. v United States, 356 US 1, 5; Atkin v Union Processing Corp., 90 AD2d 332, affd 59 NY2d 919, cert denied 465 US 1038). Even in light of this general judicial gloss, however, the statutory language easily accommodates the Attorney-General’s position that petitioners’ practice may be prohibited if it can be shown to be unreasonable.[3]
*334 Petitioners’ efforts to extract a rule of per se legality from the case law dealing with vertical territorial arrangements are unavailing for several reasons. First, the issue of per se legality of all vertical territorial arrangements was not presented in the cases cited by petitioners. In Dawn to Dusk v Brunckhorst Co. (23 AD2d 780 [2d Dept]), Stemmerman v Kelly (150 App Div 735 [1st Dept], judgment after remand affd no opn 163 App Div 892, affd no opn 220 NY 756), and Revlon Prods. Corp. v Bernstein (204 Misc 80, affd no opn 285 App Div 1139 [1st Dept]), the issue before the courts was the legality, under specific circumstances, of specific arrangements. The courts decided no more than that those arrangements did not constitute unreasonable restraints of trade.
For example, in Stemmerman (supra), the Appellate Division held that the trial court had erred in declaring the contract void without allowing the plaintiff to introduce proof tending to show the limited impact of the territorial restriction on the asphalt market — evidence relevant to a rule of reason analysis. Thus, the decision did not establish a rule of per se legality; it simply rejected the trial court’s rule of per se illegality. The Revlon Prods, (supra) decision is open to a similar interpretation (see, Robinson, Restraints on Trade and the Orderly Marketing of Goods, 45 Cornell LQ 254, 261, n 32; 263, n 40) and, in any event, was colored by the defendant’s concession that the restriction in question did not restrain trade (see, 204 Misc, at 81, supra).
In addition, this court, the final arbiter of questions of State law, did not issue or pass directly upon any of the decisions cited for the proposition advanced by petitioners. Nor do these isolated decisions from two judicial departments represent the kind of unanimous judgment of the intermediate appellate courts deserving of similar weight (cf., Matter of Knight-Ridder Broadcasting v Greenberg, 70 NY2d 151). Thus, even if the cited decisions unequivocally supported petitioners’ contention, we would not be persuaded that legislative inaction should be interpreted as acquiescence (see, Matter of Hellerstein v Assessor of Town of Islip, 37 NY2d 1, 9-10).
Finally, such a tenuous inference is even less compelling in this case, because it would result in an interpretation of the Donnelly Act at odds with the settled interpretation of its *335 Federal counterpart. Although we do not move in lockstep with the Federal courts in our interpretation of antitrust law (see, People v Roth, 52 NY2d 440), the Donnelly Act — often called a "Little Sherman Act” — should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result (see, State of New York v Mobil Oil Corp., 38 NY2d 460, 463; Matter of Aimcee Wholesale Corp. [Tomar Prods.], 21 NY2d 621, 626; Givens, Practice Commentaries, McKinney’s Cons Laws of NY, Book 19, General Business Law § 340, 1988 Cum Ann Pocket Part, at 182). Thus, we should not be eager to find that a contrary State rule has been established by a combination of equivocal pronouncements from the lower courts and legislative inaction in response to such decisions.
IV.
We conclude, therefore, that no rule of per se legality must inexorably be gleaned from the case law or the statutory language. In the absence of such a rule, we hold that the Attorney-General is authorized to conduct an investigation to test the legality of petitioners’ practices. In addition, we find no merit to petitioners’ alternative argument that the subpoenas must be quashed because the Attorney-General has commenced a civil action in Federal court, charging them with violations of the Sherman and Donnelly Acts. Section 343 specifically provides that the Attorney-General’s subpoena power does not abate by reason of any action or proceeding brought by him (see, Matter of Grandview Dairy v Lefkowitz, 76 AD2d 776, 777; State of New York v Mobil Oil Corp., 40 AD2d 369, affd 33 NY2d 627).
Accordingly, the order of the Appellate Division should be reversed and the judgments of Supreme Court reinstated.

. The Appellate Division also certified the following question: "Was the order of this Court, which reversed the six judgments (denominated orders) of the Supreme Court, properly made?” Because the order appealed from finally determines these special proceedings (see, Matter of Abrams [Anonymous], 62 NY2d 183, 192), the certified question was unnecessary and need not be answered.

. Pertinent language from General Business Law § 343, the provision which confers investigatory powers on the Attorney-General, illustrates the broad scope of that authority. The statute authorizes an investigation "[wjhenever it shall appear to the attorney general * * * that any person or persons, partnership, corporation, company, trust or association shall have engaged in or engages in or is about to engage in any act or practice by this article [the Donnelly Act] prohibited or declared to be illegal, or * * * has assisted or participated in any plan, scheme, agreement or combination of the nature described herein, or whenever he believes it to be in the public interest that an investigation be made”. That such an investigation may include the use of subpoenas and interrogatories is not disputed here.

. Thus, the dissent’s major premise — that the Donnelly Act does not expressly declare the brewers’ practice to be illegal — is flawed. The Act, by its very broad terms, declares all restraints on trade to be illegal'; it is only by judicial interpretation that some practices have been held to be outside the act’s scope. And, as noted above (supra, at 332, n 2), the Attorney-General’s investigatory powers are equally broad. Thus, our decision to *334 allow this investigation to proceed does not, as the dissent suggests, depend on the kind of extrapolation of legislative intent that we resisted in CPC Intl, v McKesson Corp. (70 NY2d 268).