OPINION OF THE COURT
Kenneth R. Fisher, J.
In 1995, plaintiff George C. Miller Brick Co., Inc., a distributor of brick and tile products, commenced this antitrust action under the Donnelly Act (General Business Law § 340 et seq.) against a supplier, defendant Stark Ceramics, Inc., seeking treble damages based on allegations of bid rigging and price fixing in April 1991 in connection with the award of a contract for *153 structural glazed facing tile on a construction project at the Albion Correctional Facility. The matter has been bifurcated for trial, the court (Stander, J.) having previously ordered separate trials on the issues of liability and damages.
Before the court are two motions brought by Miller. The first motion seeks an order (1) prohibiting Stark from putting on evidence or argument for the purpose of “explaining away” the response to interrogatory No. 18 (c); (2) prohibiting Stark from advising the jury that damages for a Donnelly Act violation are trebled; and (3) allowing evidence during the liability portion of the trial of Miller’s termination as a distributor of Stark’s products. The second motion seeks an order reconsolidating the trial.
Background
Miller was Stark’s exclusive distributor in the Rochester area. John H. Black Co. was Stark’s exclusive distributor in the Buffalo area, which includes the Albion Correctional Facility. This action is based on allegations that, after Miller was awarded the prison contract, it was pressured by Stark to relinquish the contract and to withdraw its bid so that, upon a rebidding, Black would be awarded the contract. Miller, fearful of losing its distributorship, cooperated with Stark on the condition that Black fix its price at $109,000. Upon the rebidding, Miller then followed Stark’s direction and submitted a bid six percent higher. After Black was awarded the contract, it demanded that Stark pay it $4,000, representing the difference between Miller’s original bid and Black’s subsequent bid. Stark made the payment to Black and then terminated Miller’s distributorship, allegedly because it blamed Miller for having to make the payment to Black. Miller claims damages arising from the loss of the contract and the termination of its distributorship.
Previously, it was determined by the Fourth Department that the action, as pleaded, alleges a vertical price-fixing scheme that is a per se violation of the Donnelly Act (Miller Brick Co. v Stark Ceramics, 2 AD3d 1341, 1343 [2003]; see Business Elecs. Corp. v Sharp Elecs. Corp., 485 US 717, 735-736 [1988]). The only remaining allegation of concerted action under the act involves a conspiracy between Miller, itself, and Stark,[1] distinguishing this case from Monsanto Co. v Spray-Rite Serv. *154 Corp. (465 US 752 [1984], reh denied 466 US 994 [1984]). Although the only remaining allegation of concerted action involves Miller and Stark, there is an actionable wrong under the Donnelly Act because Miller alleges it was coerced to participate in the illicit scheme (see Simpson v Union Oil Co. of Cal., 377 US 13 [1964], reh denied 377 US 949 [1964]; Isaksen v Vermont Castings, Inc., 825 F2d 1158, 1162-1163 [7th Cir 1987], cert denied 486 US 1005 [1988]; Ring v Spina, 148 F2d 647 [2d Cir 1945]; Rochez Bros., Inc. v North Am. Salt Co., Inc., 1994 WL 735932, *3, 1994 US Dist LEXIS 19421, *7 [US Dist Ct, WD Pa, Nov. 2, 1994]).[2] Moreover, the “in pari delicto” defense is not applicable to private antitrust actions such as this (see Perma Life Mufflers, Inc. v International Parts Corp., 392 US 134, 140 [1968], overruled on other grounds by Copperweld Corp. v Independence Tube Corp., 467 US 752, 765-766 [1984]; see also Bindit Corp. v Inflight Adv., 285 AD2d 309, 314 [2001]). A private antitrust action
“may be barred on the grounds of the plaintiff’s own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the [antitrust laws] and protection of the . . . public” (Bateman Eichler, Hill Richards, Inc. v Berner, 472 US 299, 310-311 [1985]).
Each of these holdings is explained below.
Vertical Restraint of Trade and Defendant’s Monsanto Argument
In view of the implication in defendant’s motion papers and its express position at oral argument that it will be entitled to a directed verdict at the end of plaintiffs case, and particularly in view of the court’s remarks during oral argument that acceptance of defendant’s Monsanto argument might indeed entitle it to judgment as a matter of law, the court finds it necessary to elucidate the effect of the Appellate Division’s decision that this is, indeed, a vertical restraint of trade case, and to dispel any misconception. The following is also necessary to provide the *155 backdrop to the discretionary rulings below. Restraints imposed by agreement between competitors are denominated as horizontal restraints while those imposed by agreement between firms at different levels of distribution are vertical restraints (see Business Elecs. Corp. v Sharp Elecs. Corp., 485 US 717, 730 [1988]). It is beyond dispute that the alleged restraint in this case is vertical since it involves a restraint imposed by agreement between a supplier and a distributor.
Under the Sherman Act, a vertical restraint of trade is not illegal per se unless it includes some agreement on price or price levels (485 US at 735-736). “Without an agreement as to a specific minimum price or price level, a vertical restraint is unlawful only if it fails a rule of reason analysis” (Euromodas, Inc. v Zanella, Ltd., 368 F3d 11, 21 [1st Cir 2004]).
Commentary to the New York Pattern Jury Instructions suggests that the rule is otherwise under the Donnelly Act. The commentary clearly indicates that vertical price fixing is not a per se violation of the Donnelly Act but is subject to the rule of reason standard (2 NY PJI3d 532 [2005]). The cases cited in the comment, however, do not support that proposition. The issue in Anheuser-Busch, Inc. v Abrams (71 NY2d 327 [1988]) concerned the authority of the Attorney General under the Donnelly Act to investigate vertically imposed exclusive territorial dealerships (71 NY2d at 331). The other case involved allegations of price discrimination, not price fixing (State of New York v Mobil Oil Corp., 38 NY2d 460, 463 [1976]).
In this case, there are allegations of vertical price fixing. When the matter was before the Fourth Department in December 2003, the issue was raised whether the per se standard or the rule of reason standard was applicable. The Fourth Department rejected defendant’s contention that the rule of reason standard applied and held that “the per se standard is properly applied where, as here, price fixing is alleged” (2 AD3d 1341, 1343 [2003]). In support of that determination, the Court cited, among other things, the United States Supreme Court’s decision Business Elees. Thus, it is the law of the case that this is a per se violation case arising under the Donnelly Act.
Concerted Action
Neither the Sherman Act nor the Donnelly Act proscribe independent action (see Monsanto Co. v Spray-Rite Serv. Corp., 465 US 752, 761 [1984], reh denied 466 US 994 [1984] [Sherman Act]; State of New York v Mobil Oil Corp., 38 NY2d 460, 464 [1976] [“a one-sided practice ... is outside the scope of the *156 (Donnelly Act)”]). Section 1 of the Sherman Act requires that there be a “contract, combination ... or conspiracy” (15 USC § 1), while the Donnelly Act requires a “contract, agreement, arrangement or combination” (General Business Law § 340 [1]).
In this case, summary judgment has been granted to Black dismissing the action against it. In its opposing papers here, defendant clearly implies that, under Monsanto and cases like it, plaintiff will not survive a motion for a directed verdict absent proof of an agreement between it and some other nonterminated distributor (such as Bock Brick Co. and Momack Building Materials) to fix prices. Defendant, however, misreads Monsanto in this regard.
In Monsanto, a terminated distributor brought an antitrust action against the manufacturer alleging that the manufacturer conspired with other distributors to fix prices. At trial, the plaintiff introduced evidence that it had been terminated by the defendant following complaints by other distributors regarding the plaintiffs price-cutting practices. On appeal from a verdict in favor of the plaintiff, the Seventh Circuit held that the evidence of the termination in response to the complaints was sufficient to raise an inference of concerted action, thus indicating “that an antitrust plaintiff can survive a motion for a directed verdict if it shows that a manufacturer terminated a price-cutting distributor in response to or following complaints by other distributors” (465 US at 759). The Supreme Court disagreed, holding that such evidence alone is not sufficient to establish concerted action and that there must be additional “evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently” (465 US at 764).
The present case is different. There is no longer any allegation, as there was in Monsanto, that defendant conspired with other distributors to fix prices. Plaintiff here, unlike the plaintiff in Monsanto, is alleging an illegal conspiracy between it and defendant to fix prices. Thus, while in Monsanto evidence of a conspiracy between the defendant and other distributors was critical to show concerted action, here it is not.
The fact that the only parties to the alleged illegal activity in this case are the plaintiff and the defendant does not preclude an action under the Sherman Act. It long has been held under the Sherman Act that “[t]here is actionable wrong whenever the restraint of trade or monopolistic practice has an impact on *157 the market; and it matters not that the complainant may be only one merchant” (Simpson v Union Oil Co. of Cal., 377 US 13, 16 [1964]). In Simpson, a retail gasoline dealer was required, by virtue of its lease and consignment agreement with its supplier, to sell gasoline at the price set by the supplier. When the retailer sold gas below the fixed price, the supplier refused to renew the retailer’s lease and terminated the consignment agreement. The retailer commenced an action under the Sherman Act against the supplier alleging that it had been economically coerced into the price-fixing scheme. The Supreme Court held that there was an actionable wrong under the Sherman Act and “[t]he fact that a retailer can refuse to deal does not give the supplier immunity if the arrangement is one of those schemes condemned by the antitrust laws” (377 US at 16; see Ring v Spina, 148 F2d 647 [2d Cir 1945] [one constrained to enter into an illegal agreement under the Sherman Act by virtue of economic necessity is not precluded from recovering damages on ground that he himself was a participant in the unlawful combination]).
More recently, Isaksen v Vermont Castings, Inc. (825 F2d 1158 [7th Cir 1987, Posner, J.], cert denied 486 US 1005 [1988]) held that it is of no moment under the Sherman Act that the only alleged concerted action involved the plaintiff and the defendant, since it was further alleged that the plaintiff was an involuntary participant (825 F2d at 1163). The plaintiff in that case, like here, was unable to allege that other distributors were involved in a conspiracy with the defendant. The Seventh Circuit, however, held that alleged concerted action involving the plaintiff “knuckling under to pressure by [the defendant] to raise his prices” could satisfy the concerted action requirement of the Sherman Act (825 F2d at 1162).
In another case, remarkably similar on its facts to the case at bar, a District Court held that the alleged “conspiracy between [the] plaintiff and . . . defendant may satisfy [the Sherman Act’s] concerted action requirement” (Rochez Bros., Inc. v North Am. Salt Co., Inc., 1994 WL 735932, *3, 1994 US Dist LEXIS 19421, *7 [US Dist Ct, WD Pa, Nov. 2, 1994]). The plaintiff in that case, as here, alleged that it was coerced into submitting a noncompetitive bid for a public works project by implicit threats from its supplier. Moreover, like this case, the plaintiff alleged that, despite its compliance with defendant’s order to bid non-competitively, the defendant thereafter terminated its relationship with plaintiff.
*158 Since Simpson, the Supreme Court has rejected the application of the “in pari delicto” (of equal fault) defense in private antitrust actions (Perma Life Mufflers, Inc. v International Parts Corp., 392 US 134, 140 [1968], overruled on other grounds by Copperweld Corp. v Independence Tube Corp., 467 US 752, 765-766 [1984]). The Court explained that preservation of the private antitrust action as “an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust law” outweighed any inequities that might result should a culpable plaintiff recover a windfall gain (392 US at 139). Indeed, the Court emphasized “ ‘the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes’ ” (Bateman Eichler, Hill Richards, Inc. v Berner, 472 US 299, 307 [1985], quoting 392 US at 138). The Court, however, refused to decide whether “truly complete involvement and participation in a monopolistic scheme could ever be a basis, wholly apart from the idea of in pari delicto,” to bar a plaintiffs cause of action (392 US at 140). The Court appears to have answered that question in Bateman.
Bateman arose in the context of a private action brought under the federal securities law. The Court clearly indicated, though, that the rule it announced in that case had broader application, including application to private antitrust actions. The Court held that:
“[A] private action for damages in these circumstances may be barred on the grounds of the plaintiffs own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the [regulatory laws] and protection of the . . . public” (472 US at 310-311).
Although the Second Department has held under Perma Life that a contracting defendant has standing to claim that its agreement violates the Donnelly Act (see Bindit Corp. v Inflight Adv., 285 AD2d 309, 314 [2001]), there are no reported cases specifically rejecting the in pari delicto defense, or adopting the standard set forth in Bateman, as a matter of state law. There appears to be no reason, however, why state antitrust cases should be treated differently than federal antitrust cases in this regard (see Anheuser-Busch, 71 NY2d at 335 [the Donnelly Act is “construed in light of Federal precedent and given a different *159 interpretation only where State policy, differences in statutory language or legislative history justify such a result”]).[3]
With this background in mind, the court turns to the procedural history of the case, and plaintiffs motions.
Relevant Procedural History
In 1997, Miller brought a motion seeking, among other things, an order deeming the subject matter of a notice to admit dated May 2, 1997 to be established as true. The subject matter of the notice to admit was Stark’s response to interrogatory No. 18 (c). In that interrogatory, Miller asked Stark to “[d] escribe the procedures which Miller . . . was supposed to follow with respect to the bidding on prison expansion projects both within and without its territory . . . .” Stark responded:
“On the prison expansion project, Stark distributors were permitted to bid if requested by the State, provided that such distributors included in their bids a factor for specification protection. A distributor who was granted an exclusive territory for a particular project would offer the product at the lowest bid price.”
The court (Lunn, J.) denied the motion as it pertained to the notice to admit, indicating that because the responses to the interrogatories were verified and sworn as true, “[they] have already been admitted as true and may not be explained away at trial.”
In November 1999, the court (Stander, J.) granted summary judgment to Stark and dismissed the second amended complaint against it. Upon reargument in May 2000, the court adhered to its earlier determination and again dismissed the second amended complaint against Stark. On appeal, however, the Fourth Department held that there are triable issues of fact whether there was a violation of the Donnelly Act by Stark and thus that it was error to grant Stark summary judgment (281 AD2d 960, 961 [2001]).
In May 2002, as relevant here, the court (Stander, J.) bifurcated the trial at the request of Stark[4] and precluded Miller, during the liability phase of the trial, from presenting evidence *160 of its termination as a distributor of Stark’s products. Miller appealed but failed to brief the issue whether the court properly bifurcated the trial. The Fourth Department affirmed, holding that the part of the order dealing with the admissibility of evidence was not appealable and that Miller abandoned the bifurcation issue by not briefing it (Miller Brick, 2 AD3d at 1343).
Present Motions
More than a year later, in September 2004, Miller brought the first of the two motions now before the court. Miller contends that, by virtue of Justice Lunn’s decision in 1997, it “is entitled to a motion in limine prohibiting [Stark] from introducing any evidence, or argument, the purpose of which is to explain away its response to interrogatory No. 18 (c).” Miller further contends, citing HBE Leasing Corp. v Frank (22 F3d 41, 46 [2d Cir 1994]), that it is improper to inform a jury that damages for a Donnelly Act violation are trebled and thus “[Stark], or its attorneys . . . [should be precluded] from making any such reference during the course of the trial.” Finally, Miller contends that, notwithstanding the previous order of the court (Stander, J.), it should be permitted to introduce evidence of its termination as a distributor during the liability portion of the trial. In support of that contention, Miller cites its belief that the prior order bifurcated only the amount of damages from the fact of damage, and argues that the fact of damage is a necessary element of liability. Miller further argues that Stark’s pretextual reasons for the termination are circumstantial evidence of an alleged agreement between Stark and its other distributors to restrain trade.
Stark opposes the motion and cross-moves for costs. In its opposing papers dated January 3, 2005, Stark contends that the motion should be denied in its entirety because it is untimely in light of a scheduling order by Stander in May 2001. Stark also contends that the motion, insofar as it seeks reargument of that part of the May 2002 order limiting evidence during the liability portion of the trial, is untimely (see CPLR 2221 [d]). In the alternative, Stark opposes reargument because Miller’s “understanding of bifurcation orders does not serve a cognizable basis for reargument” and because the claimed relevance of the evidence of the termination is spurious inasmuch as there are no *161 other alleged coconspirators. Stark additionally contends that, while it may not deny its response to interrogatory No. 18 (c), it may “offer proof to put the admission in context with other proof’ and to explain its meaning. Finally, Stark asks this court to ignore federal law on the treble damages issue and to reexamine that issue in light of state law, as a court has done in another context in New Jersey (see Wanetick v Gateway Mitsubishi, 163 NJ 484, 494-495, 750 A2d 79, 84 [2000] [there is “no compelling policy reason to justify shielding jurors from the consequences of their own actions in the jury box”]).
In the second of the two motions, dated January 13, 2005, Miller seeks an order “reconsolidating the trial of this action.” Miller contends that it has become apparent since the prior order of the court that “bifurcation is unworkable . . . [because] the issues as to the existence of an agreement, the causation between any agreement and damages, and the amount of such damages, are inextricably intertwined in this case.” Miller further contends that reconsolidation serves the interest of judicial economy because many of the witnesses in the two trials will be the same.
After receipt by the court of the second motion, Stark submitted supplemental papers dated January 15, 2005 more fully explaining its opposition to the first motion and indicating that, “in the event [Miller] does seek to reargue the motion with respect to bifurcation, it is respectfully requested that [Stark] be permitted an opportunity to fully respond to plaintiffs allegations and argument.” In its supplemental papers, Stark contends that proof of the termination is irrelevant and immaterial to the conspiracy alleged to have occurred months before April 1991 and that, in any event, such proof is inadmissible as a matter of law under Monsanto in the absence of proof that a nonterminated distributor participated in the alleged conspiracy. Finally, although conditionally requesting additional time to address the reconsolidation issue, Stark contends that bifurcation was proper because the issues of fact identified by the Fourth Department in its decision on summary judgment are separate and distinct from the issue of damages.
Discussion
Initially, the court rejects Stark’s contention that the prior scheduling order has any preclusive effect. This court has the inherent authority to control its own calendar provided that it does not exercise that discretion in a manner that conflicts with *162 an existing legislative command (see Matter of Attorney Gen. of State of N.Y. v Firetog, 94 NY2d 477, 490-491 [2000]; People v Mezon, 80 NY2d 155, 158-159 [1992]). That control is authorized whether the trial justice is the original justice assigned to the case or, as here, the justice substituted for the original presiding justice (see Matter of Public Adm’r of County of N.Y. v Cohen, 221 AD2d 297, 298 [1995]; see also Wahrhaftig v Space Design Group, 33 AD2d 953 [1970]).
Turning to the substance of the motions, the court grants that part of the first motion seeking an order prohibiting Stark from “explaining away” its verified response to interrogatory No. 18 (c) but only insofar as prohibiting Stark from denying the substance of that response. It is well settled that the response to an interrogatory is admissible as an admission of the respondent (see United Bank v Cambridge Sporting Goods Corp., 41 NY2d 254, 264 [1976], rearg denied 41 NY2d 901 [1977]; Smith v Kuhn, 221 AD2d 620, 621 [1995]; Bigelow v Acands, Inc., 196 AD2d 436, 439 [1993]). By virtue of the verification, as the court (Lunn, J.) previously indicated, Stark cannot deny the substance of its response to interrogatory No. 18 (c). However, because a response to an interrogatory is not a formal judicial admission, Stark’s response to interrogatory No. 18 (c) is not binding and may be explained (see Connors, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C3131:l, at 615 [2005 ed]; see also Ando v Woodberry, 8 NY2d 165, 171 [1960]; Ferris v Sterling, 214 NY 249 [1915]; Chamberlain v Iba, 181 NY 486, 492 [1905]; Kirby v Monroe No. 1 Bd. of Coop. Educ. Servs., 2 AD3d 1387, 1388 [2003]; Prince, Richardson on Evidence § 8-211, at 520 [Farrell 11th ed]). It will be for the trier of fact to determine the weight of the evidence in light of any explanation offered by Stark (see Ando, 8 NY2d at 171; Prince § 8-212, at 520-521).
Additionally, the court agrees with Miller that it is improper to inform a jury that damages for a Donnelly Act violation are trebled. The Donnelly Act, like the Sherman Act upon which it is modeled, requires the trebling of the damage award (see 15 USC § 15; General Business Law § 340 [5]). The weight of federal authority prohibits any mention of the trebling requirement to the jury (see HBE Leasing, 22 F3d at 46) because “[reference to treble damages and attorneysP] fees is irrelevant to the jury questions of liability and damages and may tend to confuse or prejudice a jury into reducing its eventual award, thus frustrating Congress’s goal of deterring improper *163 conduct by assessing treble damages and attorneys[’] fees.” (Id. at 45.) Under the pattern jury instructions given in antitrust cases under the Sherman Act (3A Fed Jury Frac & Instructions § 150.93 [5th ed]), and antitrust cases under the Donnelly Act (PJI 3:58 [2004]), no mention is made of the trebling requirement. Although the court can find no cases discussing this issue under the Donnelly Act, the court agrees with the rationale of the federal courts that have examined the issue (Anheuser-Busch, 71 NY2d at 335; see X.L.O. Concrete, 83 NY2d at 518). Wanetick, which is cited by Stark, arises under a New Jersey consumer fraud law and is not persuasive. The court therefore grants that part of the first motion seeking an order prohibiting Stark from advising the jury that damages for a Donnelly Act violation are trebled.
Next, the court examines the issue of reconsolidation. Given that the previous order of the court (Stander, J.) bifurcating the trial was entered without objection (see Response of Carolina, Inc. v Leasco Response, Inc., 537 F2d 1307, 1324 [5th Cir 1976]), and further, that no appeal from that order was perfected, and given the implications of effectively overruling the action of the prior justice (see Velasquez v C.F.T., Inc., 267 AD2d 229 [1999]; Dawson v Pavarini Constr. Co., 228 AD2d 468 [1996]; Padela v Rosen & Weidberg, 200 AD2d 722 [1994]; Carel Almo Serv. v Weisskopf, 42 AD2d 953 [1973]), the court denies Miller’s motion for reconsolidation. Nevertheless, the court recognizes that “[t]o be ‘liable’ under the antitrust laws . . . means that one has violated the antitrust laws and that violation has resulted in an injury to the business or property of the plaintiff, i.e., there was fact of damage” (Response, 537 F2d at 1320; see Danny Kresky Enters. Corp. v Magid, 716 F2d 206, 209-210 [3d Cir 1983]). Stated another way, to establish liability, “a plaintiff must prove the existence of ‘antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants’ acts unlawful’ ” (Atlantic Richfield Co. v USA Petroleum Co., 495 US 328, 334 [1990], quoting Brunswick Corp. v Pueblo Bowl-O-Mat, Inc., 429 US 477, 489 [1977]; see J. Truett Payne Co., Inc. v Chrysler Motors Corp., 451 US 557, 562 [1981] [“a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent”]). Indeed, it is well established that a “treble-damage plaintiff may not recover for losses due to factors other than the defendant’s [antitrust] violations” (Amerinet, Inc. v Xerox Corp., 972 F2d 1483, 1494 [8th *164 Cir 1992], cert denied 506 US 1080 [1993]). Thus, when an antitrust case has been bifurcated for trial, as this one has been, the plaintiff must establish during the liability portion of the trial that “the violation caused him injury” (Response, 537 F2d at 1321). This is true even in cases involving alleged per se violations, as here (Atlantic, 495 US at 341-345). The court therefore agrees with Miller’s contention that the “fact of damage,” i.e., whether Miller sustained an antitrust injury, is an issue that must be litigated during the liability portion of the trial.[5]
The previous order of the court (Stander, J.) merely indicated that the trial would be bifurcated “on the issues of liability and damages.” It did not address the issue, now before the court, regarding Miller’s burden of proof during the first phase of the trial. Thus, the previous order of the court is not the law of the case on that issue.
In view of the foregoing, the court reconsiders the issue of the admissibility of evidence of the termination during the liability portion of the trial. The previous determination of the court (Stander, J.) on that issue was advisory only {see Miller Brick, 2 AD3d at 1343) and thus subject to revision upon changed circumstances {see CPLR 2221 [e] [2]). Because the court now concludes that an antitrust injury is an element that must be proven during the liability portion of the trial, it is self-evident that evidence of the termination is admissible during the first phase of this trial, if for no other reason than, to show an antitrust injury.[6] The court rejects Stark’s contention that the time period set forth in CPLR 2221 (d) (3) is applicable here to Miller’s motion. The court further rejects Stark’s contention that evidence of the termination is inadmissible as a matter of law under Monsanto. {See discussion above.) The court therefore grants that part of the first motion seeking an order allowing evidence during the liability portion of the trial of Miller’s termination as a distributor of Stark’s products.
Finally, the court denies Stark’s cross motion for costs.
*165 On Motion for Reargument
Defendant Stark Ceramics moves for reargument of a prior motion, and upon reargument, for an order in limine precluding plaintiff, George C. Miller Brick Company, from adducing proof of a resale price maintenance agreement between it and Stark because such would not establish a violation of the Donnelly Act. Stark also moves for reargument of the prior motion in limine to prevent plaintiff from adducing proof of “antitrust injury” in the liability phase of the trial, consisting of evidence that Stark terminated Miller Brick’s distributorship in retaliation for having to pay another distributor, Black Brick, $4,000, representing the difference between Miller Brick’s original bid and Black Brick’s subsequent bid for the Albion Correctional Facility project. Stark further moves in limine to preclude plaintiff from offering any evidence at trial of the participation of another distributor, and the eventual bid winner on the Albion prison project, Black Brick, in the allegedly illegal bid-rigging scheme, and to preclude plaintiff from offering similar evidence of alleged participation by Momack Building Materials in the alleged conspiracy. Finally, Stark moves to preclude plaintiff from offering hearsay statements of Stark, Black Brick, Momack, or other distributors regarding the existence purpose or scope of alleged conspiracy. The background was provided in the court’s prior decision, familiarity with which is assumed.
The cornerstone of Stark’s current motion is its argument, raised for the first time in this litigation, that, unlike the Sherman Act (Dr. Miles Med. Co. v John D. Park & Sons Co., 220 US 373 [1911]), the Donnelly Act does not proscribe a vertical agreement establishing the minimum price at which a distributor may resell products purchased from its supplier. (Park & Sons Co. v National Wholesale Druggists’ Assn., 175 NY 1 [1903]; Walsh v Dwight, 40 App Div 513 [2d Dept 1899]; see also, Dawn to Dusk v Brunckhorst Co., 23 AD2d 780, 781 [2d Dept 1965] [“Nor is it violative of the statute because it fixes the . . . price to his customers and prohibits the distribution of the goods to any dealers who would resell the goods to plaintiff’]; Port Chester Wine & Liq. Shop v Miller Bros. Fruiterers, 253 App Div 188, 194 [2d Dept 1938] [the Donnelly Act “did not purport to concern itself with vertical price-fixing arrangements based on property rights in good will evidence by a trade name, brand or mark on a commodity in intrastate commerce”]; Marisch v Eastman Kodak Co., 244 App Div 295 [2d Dept 1935], affd without op 269 NY 621 [1936]; Locker v American Tobacco *166 Co., 121 App Div 443 [2d Dept 1907], affd 195 NY 565 [1909] [“producer may lawfully sell or refuse to sell to any person; may establish the sales price and terms of sale of its products, and what it may lawfully do itself it may lawfully delegate to another, and the exercise of such delegated power by the other is as lawful as if exercised by the producer itself’].)
Stark contends that this so-called New York rule is the more enlightened rule, the federal rule under the Sherman Act under the Dr. Miles Med. Co. case having been largely discredited by the courts (Isaksen v Vermont Castings, Inc., 825 F2d 1158, 1161-1162 [7th Cir 1987, Posner, J.], cert denied 486 US 1005 [1988]), and commentators (Robert Bork, The Antitrust Paradox, at 33, 289 [1978]). Thus, Stark contends that the court’s previous reliance on Anheuser-Busch, Inc. v Abrams (71 NY2d 327 [1988]), for the proposition that the Donnelly Act “should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justifies such a result” (id., 71 NY2d at 335), is misplaced to the extent it was employed to uphold the viability of plaintiffs allegations of concerted action in this case. Stark contends that Dr. Miles is in direct conflict with over a century’s jurisprudence in New York which has, according to Stark, held:
“(i) that retail price maintenance agreements pose no threat whatsoever to the competitive process that the Donnelly Act and prior state anti-trust laws were enacted to protect; and (ii) accordingly, that such laws are not intended to and do not regulate such resale price maintenance agreements in any way.” (Stark’s mem of law at 8.)
Because Stark seeks an order declaring that
“the allegations of George C. Miller Brick Company, Inc. (‘Miller Brick’) of resale price maintenance do not establish a violation of the Donnelly Act[,] and [further] precluding Miller Brick from offering proof of ‘antitrust injury’ in the liability phase, including evidence of Stark Ceramics’ termination of the distribution agreement with Miller Brick,”
plaintiff describes the motion as, in essence, one for summary judgment, which is both procedurally improper in form and untimely under the CPLR. In this, plaintiff is correct. In Scalp & Blade v Advest, Inc. (309 AD2d 219 [4th Dept 2003]), the Court held that a motion of this type “has a concretely restric *167 tive effect on the efforts of plaintiffs to prove their case against defendants and recover certain damages from them.” {Id. at 224.) Because
“the order does not merely limit the production of certain evidence . . . , but rather effectively grants defendants partial summary judgment on the critical substantive issue of what constitutes . . . plaintiffs’ causes of action[,] . . . defendants’ motion, although labeled one in limine, actually ‘was the functional equivalent of a motion for partial summary judgment dismissing the complaint’ ” (id., quoting Rondout Elec. v Dover Union Free School Dist., 304 AD2d 808, 810-811 [2d Dept 2003]).
The court agrees with plaintiff that, if the requested order was issued, it would require outright dismissal of the complaint, and therefore defendant’s motion is, in reality, in the nature of one for summary judgment. Such a motion is precluded at this stage of the proceedings because it was filed more than 120 days after the note of issue was filed. (Brill v City of New York, 2 NY3d 648 [2004]; Clermont v Hillsdale Indus., 6 AD3d 376, 378 [2d Dept 2004].)
Additionally, Stark’s current position with respect to the legality of the arrangements at issue in this case, conceived and proffered to the court for the first time on the eve of trial in this nearly 10-year-old case, is barred by two prior Appellate Division decisions which have established the law of the case. In 2001, the Appellate Division reinstated the complaint against Stark on the ground that “the distribution agreement, a letter from defendant’s representative to the distributors, and the deposition testimony of the parties raise issues of fact concerning how and when the distributors could bid on projects outside their territories and whether distributors were intended to bid, if at all, on the State project.” (Miller Brick Co. v Stark Ceramics, 281 AD2d 960, 961 [4th Dept 2001].) Thereafter, in 2003, the Appellate Division reversed my predecessor’s decision to apply the rule of reason standard, finding that the complaint, as “limited [in] its theory of liability to a violation of the Donnelly Act based on bid rigging and price fixing,” involves the application of “the per se standard” because “price fixing is alleged.” (2 AD3d at 1343 [4th Dept 2003].) On both appeals, defendant urged the Appellate Division to uphold the rulings of the court below on the ground that the distribution agreements involved in the case in no way violated the antitrust laws of the State of New York. (See, 281 AD2d 960 [2001] [defendants/respondents’ *168 brief (at 9) maintaining that the core of the illegal agreement alleged by plaintiffs instead “was entirely in accord with the terms of the Distribution Agreement and Bulletins”—thus, the only acts taken by Stark Ceramics in relation to the New York State Prison Expansion Program were to enforce the terms of its distributorship agreement, resolve conflicts between distributors, and to ultimately terminate Miller Brick pursuant to the terms set forth in the Distribution Agreement”].) Moreover, in Miller Brick (2 AD3d 281 [2003] [brief on behalf of Stark Ceramics, Inc., at 14]), Stark presented the exact same argument that it presented originally on the motion now sought to be reargued: “However, in order for a manufacturer’s termination of a distributor to fall within the category of per se illegal restrains (sic), the termination must have been pursuant to a minimum price fixing agreement with at least one other non-terminated distributor.” This is, indeed, the same Monsanto argument rejected by the undersigned in its decision and order earlier this year, and was therefore fully rejected also by the Appellate Division in 2003. Implicit in these determinations was a corollary decision that the cases now cited by defendant do not preclude relief on the remaining cause of action to be tried in this case. Accordingly, the determinations by the Appellate Division on each of the indicated appeals is law of the case, thereby requiring denial of Stark’s current motion.
On the merits, however, the Anheuser-Busch case is precisely on point, in that it rejected the very argument defendant now makes for the first time in this litigation that vertical restraint agreements are legal in this state. In that case, the targets of a grand jury investigation moved to quash a subpoena issued by the Attorney General pursuant to an investigation into marketing practices in the beer industry alleged to violate the Donnelly Act. As defendant now maintains on this motion to reargue, the targets of the subpoenas maintained that the vertical territorial and other arrangements at issue in that case were per se legal and that such legality was “established by ‘seven decades of unanimous precedent’ and that the Legislature has acquiesced in such an interpretation of the Donnelly Act by failing to amend the statute to overrule those decisions.” (71 NY2d at 333.) The cases relied on by the grand jury targets referred to above (71 NY2d at 330 [Points of Counsel]), and Judge Bellacosa as the lone dissenter (71 NY2d at 336-339), are the cases Stark now relies upon in its motion for reargument and reconsideration. The majority opinion
*169 “ conclude [d], however, that the cases cited by petitioners do not conclusively establish, either singly or in combination, a rule of per se legality for vertical territorial arrangements [,] [n]or does the statutory language foreclose the Attorney-General’s position that such arrangements, if shown to result in an unreasonable restraint of trade under the circumstances, are prohibited.” (71 NY2d at 333.)
This case involves much more than a simple vertical territorial arrangement, although plaintiff clearly alleges that such a vertical territorial arrangement existed. In addition, plaintiff alleges that the territorial arrangement included a key element of price fixing and that such price fixing was enforced by enforced bid rigging and, in addition, termination of a distributor who not only bid outside its territory but undercut the distributor assigned to that territory. Plaintiff claims to be the victim of the scheme after having been forced by Stark to agree to it. As the Court of Appeals has held, the Donnelly Act reaches such conduct even if the conspiracy is wholly vertical, i.e., supplier/ manufacturer and distributor. (Creative Trading Co. v Larkin-Pluznick-Larkin, Inc., 148 AD2d 352, 354-357, 356 [1st Dept 1989, Sullivan, J., dissenting], revd on dissenting op below 75 NY2d 830 [1990] [the Donnelly Act reaches “competing distributors who conspire among themselves and with a supplier to terminate a fellow distributor for selling at a discount” (emphasis supplied)], citing United States v General Motors Corp., 384 US 127 [1966]; see also, Bedell Wholesale Co. v Philip Morris, 272 AD2d 854 [4th Dept 2000] [noted in 103 NY Jur 2d, Trade Regulation § 19, 2003 Cum Supp, at 70, which cited Creative Trading Co. v Larkin-Pluznick-Larkin, Inc. (supra), and involved a vertical restraint with no horizontal components]). Even the leading New York treatise on the subject acknowledges that the Donnelly Act would apply in these circumstances, although the author speculates that the Court of Appeals might prefer a rule of reason standard to the per se standard in light of the cases cited by Stark. (Robert L. Haig, Commercial Litigation in the New York State Courts § 79:20, at 1267-1268 [4-A West’s NY Prac Series 2005].) In this case, the 2003 Appellate Division decision forecloses any argument on that score.
And even that does not describe the end of plaintiffs allegations in this case. Ultimately, this is not solely a “resale price maintenance” case of the kind upheld by the cited New York decisions under the Donnelly Act. As pointed out in plaintiff’s *170 memorandum of law, resale price maintenance cases “typically describe those situations where a manufacturer specifies a minimum price list for its product line and prohibits its distributors from underselling one another by lower than that price.” (Id. at 6-7 n 3.) According to plaintiff, “Stark did not have a ‘resale price maintenance’ policy in the traditional sense[;] [i]nstead, Stark had a bid rigging policy that fixed the price for prison expansion project sales at a certain level,” and a termination policy when one distributor, i.e., plaintiff, attempted to undersell (i.e., underbid) on a project. Accordingly, if plaintiff proves its case, defendant will be found guilty of bid rigging under the Donnelly Act. (Cf., People v Schwartz, 160 AD2d 964 [2d Dept 1990].)
Finally, Stark’s contention that the doctrine of collateral estoppel precludes it from proving that Black Brick and Mo-mack participated in the alleged illegal scheme is without merit. First, the dismissal of Black Brick from the complaint does not create a preclusion except insofar as Black Brick’s potential liability to plaintiff is concerned. Plaintiff’s purpose in proving the circumstances surrounding Black Brick’s ultimate award of the bid in question, and the participation of Momack, is not for the purpose of establishing their liability. Rather, such evidence is adduced for the purpose of showing that Stark was part of the conspiracy with plaintiff, one of its many New York distributors. Such evidence, under the theory pursued by plaintiff, described in the Appellate Division decisions and this court’s February decision and order in this case, will not require any special interrogatories to the jury as to their participation. The only question the jury will be asked to answer is whether Stark participated with the plaintiff in the alleged scheme, and they may surely consider on relevancy grounds Stark’s contemporaneous arrangements with other similarly situated distributors in upstate New York in making that determination. Thus, as plaintiff contends, the issue is not one of issue preclusion under the collateral estoppel doctrine, but whether, as law of the case, Black Brick’s dismissal from the complaint, which went unappealed, can preclude plaintiff’s effort to show that defendant was part of a conspiracy with it by reference to evidence that other distributors similarly situated, except as to territory, had a similar arrangement. Nothing in the law of the case doctrine *171 directs a court to preclude the proffered evidence, and, accordingly, the motion is denied.[7]
The balance of defendant’s motion seeking preclusion of hearsay evidence is denied inasmuch as there is no specification of what is sought to be excluded.
Conclusion
Defendant’s motion is denied in its entirety.

. Although initially Black was named as a codefendant, in 1999 Black was granted summary judgment dismissing the action against it and thereafter the action was discontinued against Black.

. The Donnelly Act is “construed in light of Federal precedent and given a different interpretation only where State policy, differences in statutory language or the legislative history justify such a result” (Anheuser-Busch, Inc. v Abrams, 71 NY2d 327, 335 [1988]; see X.L.O. Concrete Corp. v Rivergate Corp., 83 NY2d 513, 518 [1994]).

. See below, on motion for reargument.

. Stark contended that “the issues of damages and liability are completely unrelated. The existence of a price-fixing conspiracy has no bearing on the measure of damages purportedly sustained by [Miller] after its termination as a . . . distributor.” According to Stark, bifurcation would “further judicial *160 economy, promote juror understanding of the issues, and require shorter and less encompassing closing arguments and jury charges.” Miller did not oppose bifurcation.

. Assuming that the trier of fact returns a verdict in favor of Miller during the liability portion of the trial, it will then be Miller’s burden of proof during the damage portion of the trial to show “the amount of damages” (see Rossi v Standard Roofing, Inc., 156 F3d 452, 484 [3d Cir 1998]).

. Even under the previous order of the court, it was recognized that evidence of the termination was relevant on the issue of damages.

. Stark’s current position is ironic, given that it argued on the original motion that the charged conspiracy between it and plaintiff could not be shown under Monsanto absent proof that defendant also agreed on similar terms with its other nonterminated distributors. That motion proceeded, and was decided, on the assumption that plaintiff had no other proof of the agreement between it and Stark. This motion was brought in response to plaintiffs assurances after the court’s decision that, indeed, it had such other proof.
The court also rejects Stark’s argument that it had insufficient discovery of such proof. Plaintiff provided interrogatory answers identifying the “other distributors” as having been involved in the conspiracy and, in any event, it is no secret who Stark’s upstate distributors were and their respective territories.